IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TERI GREIG as Special Administrator of the )
Succession of MICHAEL E. GREIG, Deceased, and )
TERRI GREIG, Individually as Representative )
Heir at Law of MICHAEL E. GREIG, Deceased, )
 )
                                           *Plaintiff,* )
 )
v )   Case No. 08-1181-EFM
 )
MAGED S. BOTROS, M.D., )
 )
                                           *Defendant.* )

**MEMORANDUM AND ORDER**

This is a medical malpractice action which is before the court upon plaintiff's and defendant's motions for partial summary judgment.[1] This case arises from the death of Michael Greig on June 20, 2006 at Via Christi Regional Medical Center in Wichita, Kansas. Plaintiff is Greig's widow and representative of his estate and his heirs at law. Defendant is the emergency room physician who first examined Greig and admitted him into the hospital.

## I. UNCONTROVERTED FACTS

On June 19, 2006 at approximately 5:00 p.m., 36-year-old Michael Grieg entered the emergency department of Via Christi's St. Francis Campus in Wichita, Kansas. He had been lifting weights at a YMCA. His chief complaint was chest pain which started at approximately 4:30 p.m. Defendant, Dr. Maged Botros, was the emergency room physician who examined Greig. Defendant recommended further testing and admission into the hospital's Clinical Decision Unit (CDU). Greig

---

[1]Doc. Nos. 71 and 95.

was admitted to that unit at about 7:10 p.m. At approximately 11:15 p.m., defendant examined Greig in the CDU. This was his last involvement with Greig; defendant's shift in the emergency department ended shortly thereafter.

Dr. David Tucker worked in the emergency room at the hospital from 10:00 p.m. on June 19, 2006 until 7:00 a.m. on June 20th. He was available if contacted by the CDU nurse. At approximately 5:20 a.m. on June 20th, Nurse Halford in the CDU contacted Dr. Tucker by phone to advise him that the morphine sulfate was not controlling Greig's pain. Dr. Tucker ordered Toradol, a muscle relaxant.

At about 6:30 a.m., Dr. Andrew Auerbach made rounds in the CDU prior to starting his shift in the emergency department. The procedure for covering the CDU for the morning shift was that the doctor coming would make initial rounds to see if there were any problems or to get any information from the nursing staff if there was anything specific that needed to be done at that time. At approximately 7:40 a.m., Greig was found ashen and slumped over in a chair. A code was called but CPR measures were not successful. Greig died from a hemopericardium and ruptured dissecting thoracic aneurysm.

Plaintiff's expert emergency medical physician, Dr. Robert Rogers, criticized defendant and Drs. Tucker and Auerbach for not ordering a chest CT scan. Plaintiff's expert cardiothoracic surgeon, Dr. John Robertson, was critical of Dr. Tucker for not ordering a cardiology consult, a CT scan or a TEE (transesophageal echocardiogram).

In evaluation of a possible aortic dissection, a doctor can complete a physical examination and run multiple objective tests, including but not limited to an MRI of the chest, a CT scan of the chest, a TEE, or an arteriogram. Dr. Robertson has stated that if defendant had completed a proper

work-up, the aortic dissection would have been discovered and surgery could have saved Greig from dying. Dr. Rogers testified that a subsequent physician often learns more than the original physician as time passes, such, as in this case, from Greig's continued chest pain after defendant's shift.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is proper if the moving party establishes that "there is no genuine issue as to any material fact" and if the moving party is entitled to have all or part of a claim decided in his favor as a matter of law.[2]  A "genuine" issue of fact is one for which the evidence allows a reasonable jury to resolve the issue either way."[3]  A "material" fact is one which "is essential to the proper disposition of the claim."[4]  The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[5]  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.[6]  The moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[7]

The party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[8]  The opposing party must "set forth specific facts

---

[2] *Fed.R.Civ.P. 56(a), (b)* and *(c)(2)*.

[3] *Haynes v. Level 3 Comm., LLC*, 456 F.3d 1215, 1219 (10th Cir .2006) *cert. denied*, 549 U.S. 1252 (2007).

[4] *Id.*

[5] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir.2004)(quoting *N.Tex.Prod.Credit Ass'n v. McCurtain County Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7] *Id.* (citing *Celotex*, 477 U.S. at 325).

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir.2005).

that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[11] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[12]

Finally, summary judgment is not a "disfavored procedural shortcut," but an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13] However, negligence is generally a fact question left to a jury and should be answered by the court only "'in rare cases where the evidence is susceptible to only one possible inference.'"[14] Similarly, causation is an issue generally determined by a jury.[15]

### III. PLAINTIFF'S ARGUMENTS FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's motion for partial summary judgment asks the court to bar defendant from comparing defendant's alleged fault in this matter with the alleged fault of two other doctors (Dr.

---

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir.2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).

[10]*Adler*, 144 F.3d at 671.

[11]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

[12]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir.2004).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

[14]*Roberts v. Printup*, 422 F.3d 1211, 1218 (10th Cir. 2005)(quoting *Carl v. City of Overland Park*, 65 F.3d 866, 869 (10th Cir. 1995)).

[15]See *Schmeck v. City of Shawnee*, 651 P.2d 585, 598 (Kan. 1982)(negligence, contributory negligence and proximate cause are all jury issues); *Stetler v. Fosha*, 682 P.2d 682, 685 (Kan.App. 1984)(causation, like negligence is generally to be determined by a jury).

David Tucker and Dr. Andrew Auerbach) who have not been named as defendants. Plaintiff makes two arguments against defendant's claim that Dr. Tucker and Dr. Auerbach are at fault for Greig's death. First, plaintiff contends that neither Dr. Tucker nor Dr. Auerbach owed a legal duty to Greig because they did not have a physician-patient relationship with him. Second, plaintiff contends that Dr. Tucker's and Dr. Auerbach's acts and omissions did not contribute to Greig's death.

    A. <u>Physician-patient relationship</u>

"'A medical malpractice claim requires the same elements of proof as any negligence action: (1) the existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury suffered."[16] In this case, plaintiff has the burden of proof to establish the elements of a negligence claim against defendant and defendant has the burden of proving the fault of Dr. Tucker and Dr. Auerbach.[17] "[A]llegations that a nonparty's negligence caused a plaintiff's harm must be supported by adequate evidence before the negligence of that person may be argued to the jury or before the judge may instruct the jury to compare the nonparty's fault."[18]

Kansas law requires expert testimony to establish that the accepted standard of medical care was breached when the lack of reasonable care would not be apparent to the average layman.[19] However, the existence of any duty of care in a medical malpractice action is dependent on the

---

[16]*Seeber v. Ebeling*, 141 P.3d 1180, 1185 (Kan.App. 2006)(quoting *Watkins v. McAllister*, 59 P.3d 1021, 1023 (Kan.App. 2002)).

[17]*Id.* (plaintiff's burden); *Wooderson v. Ortho Pharmaceutical Corp.*, 681 P.2d 1038, 1058-59 (Kan. 1984)(defendant's burden to prove negligence to compare fault).

[18]*Gust v. Jones*, 162 F.3d 587, 593 (10th Cir. 1998).

[19]*Id.* at 593-94.

existence of a physician-patient relationship.[20] This is generally a question of fact for the jury, although summary judgment is available when the facts shown by the evidence would lead the jury to only one reasonable conclusion.[21]

The Kansas Supreme Court has discussed the requirements for a physician-patient relationship.

> A physician-patient relation is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established.[22]

A physician-patient relationship may exist even when a physician has not dealt directly with the patient.[23] "The important fact in determining whether the relationship is a consensual one . . . is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit. . . . Where . . . healthcare services are rendered on behalf of the patient, and are done for the patient's benefit, a consensual physician-patient relationship exists for the purposes of medical malpractice."[24] The Ohio Supreme Court concluded after surveying numerous cases that the "basic underlying concept is that a physician-patient relationship and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's benefit" such as the physician's agreement with an institution to provide care for its

---

[20]*Seeber*, 141 P.3d at 1185.

[21]*Id.*

[22]*Adams v. Via Christi Regional Med. Center*, 19 P.3d 132, 140 (Kan. 2001).

[23]*Id.*

[24]*Walters v. Rinker*, 520 N.E.2d 468, 472 (Ind.App. 1988); see also, *Sterling v. Johns Hopkins Hosp.*, 802 A.2d 440, 455 (Md.App. 2002)("In the final analysis, we take it as well-settled that a physician-patient relationship may arise by implication where the doctor takes affirmative action to participate in the care and treatment of a patient.").

patients.[25]

The court believes that a material issue of fact exists as to whether Dr. Tucker and Dr. Auerbach had a physician-patient relationship with Greig. There is evidence that both doctors acted affirmatively with regard to Greig's treatment, although in Dr. Auerbach's case his actions were limited to reviewing the chart, writing a progress note and looking in on Greig to find him sleeping. It also appears at least arguable that both doctors had agreements with the hospital to care for the patients in CDU during their work shifts at the hospital.

The two cases which plaintiff claims are comparable involve doctors acting in a consulting relationship and are distinguishable from this case. One case involved a child neurologist who consulted over the telephone with a patient's treating doctor.[26] The two doctors agreed to perform a procedure upon the patient the next day, but prior to the procedure the patient suffered a severe brain injury. The court held that the child neurologist had no legal duty to the patient, noting:

> the sole involvement of Gilmartin [the child neurologist] was as a private practitioner who had been asked to carry out a consultation the following day. . . At the time Gilmartin spoke with Smith [the treating physician], Gilmartin had not examined [the patient], had not reviewed her hospital chart, and had never spoken with either her or her parents. The only information he had was what he had been told by Smith. There is no claim that Gilmartin entered any orders in the case or took any other action other than discussing the case in general terms with Smith and agreeing to consult the next day. This, by itself, does not create a physician-patient relationship.[27]

In contrast, in this case Drs. Tucker and Auerbach appear to have had a contractual relationship with the hospital. Dr. Auerbach reviewed Greig's chart and Dr. Tucker had entered an order relating to

---

[25]*Lownsbury v. VanBuren*, 762 N.E.2d 354, 360 (Ohio 2002).

[26]*Irvin v. Smith,* 31 P.3d 934 (Kan. 2001).

[27]*Id.* at 942-43.

Greig's treatment. Dr. Auerbach also wrote a progress note regarding Greig and was intending to discuss the treatment plan with Greig, but found him sleeping and did not disturb him.

In the other case cited by plaintiff, the court assumed there was a physician-patient relationship, but found that the duty of the consulting physician did not extend to overriding the decisions of the treating physician and arranging for a transfer to another hospital.[28] Obviously, this holding is distinguishable from the facts in this case because Drs. Tucker and Auerbach were not consulting physicians and there is an issue of fact as to whether they were responsible for Greig's treatment during their hours on duty at the hospital.

B. Fault

Plaintiff's second argument for partial summary judgment is that defendant cannot demonstrate that either Dr. Tucker or Dr. Auerbach acted negligently or that their actions or omissions contributed to Greig's death. Defendant responds generally that plaintiff's expert witnesses provide evidence that Drs. Tucker and Auerbach acted negligently and that there is a material issue of fact as to whether their acts or omissions contributed to Greig's death. The court concurs with defendant's position as regards Dr. Tucker. As for Dr. Auerbach, the court finds there is insufficient evidence to support a finding that Dr. Auerbach's alleged fault contributed to Greig's death.

The following facts are largely undisputed. Greig died because of an aortic dissection. Greig coded at approximately 7:40 a.m. and could not be resuscitated. Greig had symptoms consistent with aortic dissection. Aortic dissection can be reliably detected with a CT scan or a TEE. There is a substantial chance that timely surgery would have saved Greig's life.

---

[28]*Dodd-Anderson v. Stevens*, 905 F.Supp. 937, 948 (D.Kan. 1995).

In addition, there is evidence that a CT scan can be obtained at a hospital in 5 or 10 minutes and, generally, within an hour.[29] There is further testimony that the passage of time, combined with Greig's continuing complaints of pain, made it more evident to the physicians that followed defendant that Greig should be examined for aortic dissection.[30] The court finds that this evidence is sufficient to create a material issue as to Dr. Tucker's and Dr. Auerbach's fault.

Plaintiff contends that these doctors' fault did not contribute to Greig's death. The court believes this is a contested fact issue as to Dr. Tucker. There is an issue of fact as to when his duty of care toward Greig began. While plaintiff contends that at best Dr. Tucker's duty of care began at 5:20 a.m. when he was contacted by a nurse and gave an order for muscle relaxant, there is evidence to support a duty of care starting several hours earlier when Dr. Tucker's shift began or when defendant's shift ended. As already noted, there is evidence that a CT scan could be completed in a matter of minutes. There is also evidence that surgery could be arranged in an hour or two.[31]

As regards Dr. Auerbach, the court finds that defendant cannot prove that Dr. Auerbach's alleged fault contributed to Greig's death. Dr. Auerbach's shift started at 6:30 a.m. and he wrote a progress note regarding Greig at that time. There is evidence that Greig was out of his bed and attempting to put on his shoes when he coded at approximately 7:40 a.m. One of plaintiff's experts, Dr. Janiak, testified that medication to reduce blood pressure and bed rest might or might not have

---

[29] Doc. No. 72, Exhibit L at p. 208 of the deposition.

[30] Id. at pp. 228-29; Doc. No. 72, Exhibit O at p. 145-46 of the deposition; Doc. No. 72, Exhibit P at pp. 142-47 of the deposition.

[31] Doc. No. 72, Exhibit O at p. 151 of the deposition.

delayed the rupture which caused Greig's demise.³² Dr. Janiak also testified that if a report of continuing pain caused Dr. Auerbach or another doctor to send Greig for a CT scan at 6:30 a.m. that it would have been "too late" to save Greig's life.³³

The court concludes that defendant has not produced evidence creating a genuine issue of material fact as to whether Dr. Auerbach, when he started his shift, could have delayed or prevented Greig's death by ordering a CT scan, mandating bed rest and medication, and calling for surgery. Therefore, partial summary judgment shall be granted as to the issue of Dr. Auerbach's comparative fault. Otherwise, plaintiff's motion for partial summary judgment shall be denied.

## IV. DEFENDANT'S ARGUMENTS FOR PARTIAL SUMMARY JUDGMENT

Defendant's motion for partial summary judgment seeks to narrow plaintiff's allegations of negligence as recounted in the final pretrial order. Specifically, defendant contends that the court should strike the following allegations from plaintiff's claims of negligence: 1) that defendant failed to "palpate for pulsation of Mr. Greig's anterior chest wall;" 2) that defendant failed to consider "dsyphagia (esophageal compression) as a sign and associated symptom of a thoracic aneurysm given Mr. Greig's complaints;" 3) that defendant failed "to appreciate that hoarseness was consistent with a thoracic aneurysm;" 4) that defendant "failed to obtain a thorough history of the events surrounding the onset of chest pain and the quality, severity and location of the chest pain;" 5) that defendant noted "in the emergency room record that Greig was stable for discharge to home;" and 6) any other contention not supported by expert testimony.³⁴ Defendant argues that these

---

³²Doc. No. 72, Exhibit P at pp. 148-49 of the deposition.

³³Id. at p. 148.

³⁴Doc. No. 96 at p. 13.

contentions must be stricken because there is no expert testimony to support them and that such expert testimony is required in a medical malpractice case.

Plaintiff does not dispute the legal standards set forth in defendant's motion. Specifically, it is undisputed that ultimately plaintiff must prove that defendant breached or deviated from the standard of care owed to Greig and that Greig was injured because of defendant's breach or deviation from the standard of care. Plaintiff also does not dispute that in this medical malpractice case, expert testimony is necessary to establish a breach or deviation from the standard of care and that the breach or deviation caused or contributed to Greig's death. The issue raised by defendant's motion for partial summary judgment is whether there is a lack of evidence, specifically expert evidence, necessary to support certain claims of negligence made in the pretrial order.

A. <u>Failure to palpate for pulsation of the anterior chest wall</u>

In response to defendant's motion, plaintiff makes reference to portions of the record indicating that palpable pulsation of the anterior chest wall is a factor relevant to a diagnosis of aortic dissection and that this factor may or may not have been checked by defendant. Plaintiff does not reference expert testimony or an expert report which states that the failure to palpate for pulsation of the anterior chest wall was a breach or deviation from the standard of care or that it contributed to or caused Greig's death. Therefore, the court shall strike this claim of negligence.

B. <u>Failure to consider dysphagia (esophageal compressions) as a symptom of thoracic aneurysm</u>

Plaintiff makes reference to portions of the record indicating that dysphagia, which may present as a lump in the throat or the thorax or the abdomen, is a factor relevant to the diagnosis of aortic dissection. Plaintiff also refers to evidence that Greig complained of a lump or a bubble in

his chest and that this complaint was recorded in the records and relayed to defendant. Finally, plaintiff cites the statement of Dr. John Robertson, an expert witness in this case, who stated in his deposition: "This case is a guy that came in, was having a lot of pain, nausea, vomiting, diaphoresis, radiation of pain to his neck, a lump in his chest, which is a classic description of dissection in some cases, and nothing was done."[35] Dr. Robertson continued in his deposition that he was "blown out of the water" that defendant had never gotten a cardiology consult in the ER and that the failure to get a cardiology consult in Greig's case was "ridiculous."[36] Dr. Robertson's opinion letter states:

> While Mr. Greig's history and subjective complaints of persistent chest pain of an undetected origin called for a differential diagnosis that gave strong consideration to possible aortic dissection, [defendant] strictly adhered to his working diagnosis of acute coronary syndrome, and did not order appropriate imaging studies - including a chest CT or transesophageal echocardiogram - that would have detected an aortic dissection. A proper cardiac consultation also could have led to an appropriate diagnosis of the patient's aortic dissection. Had the appropriate imaging studies been ordered, the aortic dissection would hve been detected in a timely fashion, and the patient's mortality rate would have been 20% at most.[37]

The court believes this is sufficient evidence to support a claim that the failure to consider dysphagia as part of Greig's history and subjective complaints was a breach or deviation from the standard of care that caused or contributed to Greig's death. Therefore, the court shall not strike this claim from plaintiff's allegations of negligence.

      C. <u>Failure to appreciate that hoarseness was consistent with a thoracic aneurysm</u>

Plaintiff has referred to evidence that Greig almost sounded hoarse when he spoke with his wife over the phone from the hospital and that hoarseness is a symptom associated with aortic

---

[35]Doc. 98, Exhibit K at pp. 101-02 of the deposition.

[36]Id. at 102.

[37]Doc. 96, Exhibit D at p. 2.

dissection - one that should lead a diagnostician to more seriously consider the possibility of aortic dissection. Plaintiff does not reference expert testimony or an expert report which states that the failure to appreciate that hoarseness was consistent with a thoracic aneurysm was a breach or deviation from the standard of care or that it contributed to or caused Greig's death. Therefore, the court shall strike this claim of negligence.

        D. <u>Failure to obtain a thorough history of the events surrounding the onset of chest pain and the quality, severity and location of the chest pain</u>

Plaintiff has cited evidence that dizziness and that a tearing or ripping kind of chest pain have been related to aortic dissection. Plaintiff has further referred to testimony that Greig told his wife and a friend that he had these symptoms. Plaintiff notes that one of defendant's experts has testified that it is important for a diagnostician to determine if pain started suddenly or gradually; whether the pain radiated when it started; and how sharp or strong the pain was. Plaintiff does not reference expert testimony or an expert report which states that the failure to obtain a better history of the events surrounding the onset of chest pain or the quality, severity and location of the chest pain was a breach or deviation from the standard of care or that it contributed to or caused Greig's death. Therefore, the court shall strike this claim of negligence.

        E. <u>Noting in the emergency room record that Greig was stable for discharge to home</u>

Plaintiff refers to Dr. Robertson's deposition where the doctor states that this notation gave Dr. Robertson "real concern."[38] However, plaintiff does not refer to evidence that this notation constituted a breach or deviation from the standard of care or that it contributed to or caused Greig's death. Therefore, the court shall strike this claim of negligence.

---

[38]Doc. No. 98, Exhibit K at pp. 140-41 of the deposition.

F. <u>Any other contention not supported by expert testimony</u>

Defendant does not adequately identify what these alleged unsupported contentions are so that the court may properly consider defendant's argument. Nor does defendant demonstrate that there is a lack of evidence to support the contentions. Therefore, the court shall reject this part of defendant's motion for partial summary judgment.

## V. CONCLUSION

For the above-stated reasons, plaintiff's motion for partial summary judgment (Doc. No. 71) shall be GRANTED IN PART. Defendant shall not be permitted to compare the alleged fault of Dr. Auerbach. Otherwise, plaintiff's motion is denied. Defendant's motion for partial summary judgment (Doc. No. 95) shall also be GRANTED IN PART. The court shall strike plaintiff's claims that: defendant was negligent because he failed to palpate for pulsation of Greig's anterior chest wall; defendant was negligent because he failed to appreciate that hoarseness was consistent with a thoracic aneurysm; defendant was negligent because he failed to obtain a better history of the events surrounding the onset of chest pain or the quality, severity and location of the chest pain; and defendant was negligent because he noted in the emergency room record that Greig was stable for discharge to home. Otherwise, defendant's motion is denied.

**IT IS SO ORDERED.**

Dated this 14th day of March, 2011.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE